# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

CHELSEA N. COMBS
Plaintiff,

Case No. 1:18-cv-647
Barrett, J.
Litkovitz, M.J.

vs.

COMMISSIONER OF
SOCIAL SECURITY,
Defendant.

**REPORT AND
RECOMMENDATION**

Plaintiff Chelsea N. Combs brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is before the Court on plaintiff's Statement of Errors (Doc. 9), the Commissioner's response in opposition (Doc. 13), and plaintiff's reply (Doc. 14).

## I. Procedural Background

Plaintiff protectively filed her application for SSI in March 2015 and for DIB in May 2015, alleging disability since April 2, 2014, due to depressive disorder, not otherwise specified; anxiety disorder, not otherwise specified; autistic disorder; irritable bowel syndrome; vision problems; headaches; poor socialization; literacy problems; learning problems; and mild mental

retardation.[1]  After initial administrative denials of her claim, plaintiff was afforded a hearing before administrative law judge (ALJ) Gregory Kenyon on September 7, 2017.  On March 8, 2018, the ALJ issued a decision denying plaintiff's DIB and SSI applications.  Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI).  The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her

---

[1] In 2013, the Commissioner amended the regulation at issue in this appeal by replacing the term "mental retardation" with "intellectual disability," which did not affect any substantive change.  *Pennington v. Commr. of Soc. Sec.*, No. 1:17-cv-264, 2018 WL 3386309, at *3 (S.D. Ohio July 12, 2018) (Report and Recommendation), *adopted*, 2018 WL 4223135 (S.D. Ohio Sept. 5, 2018) (citing *Change in Terminology: "Mental Retardation" to "Intellectual Disability,"* 78 Fed. Reg. 46,499, 46,500-1 (Aug. 1, 2013) (codified at 20 C.F.R. Pt. 404, Subpt. P, App. 1).  This opinion uses both terms depending on the context because the medical and other records submitted in support of plaintiff's claims, and earlier applicable case law, make specific references to both terms.

physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] meets the insured status requirements of the Social Security Act through September 30, 2021.

2. The [plaintiff] has not engaged in substantial gainful activity since April 2, 2014, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).

3. The [plaintiff] has the following severe impairments: obesity, autism spectrum disorder, borderline intellectual functioning, depression, and an anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, [the ALJ] finds that the [plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), subject to the following limitations: (1) frequent stooping; (2) no climbing of ladders, ropes, or scaffolds; (3) no work around hazards such as unprotected heights or dangerous machinery; (4) limited to performing unskilled, simple, repetitive tasks; (5) occasional superficial contact with co-workers and supervisors (superficial contact is defined as retaining the ability to receive instructions, ask simple questions, request assistance, and receive performance appraisals but lacking the ability to engage in more complex social interactions such as rendering advice or persuading others); (6) no public contact; (7) no teamwork or tandem tasks; (8) no fast paced production work or jobs which involve strict production quotas; and (9) limited to performing jobs which involve very little, if any, change in the job duties or the work routine from one day to the next.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[2]

7. The [plaintiff] was born [in] . . . 1990 and was 24 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the [plaintiff]'s past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national

---

[2] Plaintiff's past relevant work was as an animal caretaker, a medium exertion, semi-skilled position which was unskilled as performed by plaintiff. (Tr. 23, 64).

economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[3]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from April 2, 2014, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-24).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the

---

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative medium, unskilled occupations such as warehouse worker (200,000 jobs nationally), industrial cleaner (300,000 jobs nationally), and floor waxer (100,000 jobs nationally). (Tr. 24, 65-66).

plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

## D.    Educational and Medical Evidence

### 1.    Educational Records

Plaintiff's school records from Middletown City School District disclose she received special education services starting in 1998, when it was determined she qualified for "other health impaired-minor services" while attending elementary school. (Tr. 364). She attended general education classes in the 11th grade with tutorial support received through special education services. (*Id.*). She was in the "Equitation" program and planned to change to the pre-veterinarian program the next year and then attend school for the 13th year. (*Id.*). On standardized testing, her reading score was 75 with a percentile rank of 5%, and her math score was 53 with a percentile rank of 0.1 %. (Tr. 365).

As part of plaintiff's Evaluation Team Report in February 2007, when plaintiff was 17 years old, a School Psychologist administered the Wechsler Abbreviated Scale of Intelligence (WAIS) test to plaintiff. (Tr. 368). Plaintiff achieved a full-scale IQ score of 96, and her true IQ score was estimated to be about 90 out of 100. (*Id.*). It was noted that her previous IQ score was

80. (*Id.*). The results showed she had "the ability to perform age appropriate cognitive activities." (*Id.*).

An Individualized Education Program (IEP) report dated March 2008 lists the accommodations plaintiff received, which were: extended time, spell check, resource room access, the option to have tests and quizzes read aloud to her, and the option to retake any test on which she scored below "70." (Tr. 348). She spent less than 21% of the day outside of a regular classroom setting. (Tr. 356). She earned letter grades of A, B, and C throughout high school. (Tr. 341). In June 2008, she passed all sections of the Ohio graduation test. (Tr. 360).

## 2. **Medical Records**

### i. *Dr. Robert N. Basil, Psy.D.*

Plaintiff treated with Dr. Basil from May 2013 until January 2014. (Tr. 389). Dr. Basil saw plaintiff for ten sessions, four of which entailed psychological testing. When seen by Dr. Basil on January 7, 2014, plaintiff reported that she was depressed, her nerves "were shot," she was "taking it out" on herself and others, and she could not keep a job. (Tr. 391). She indicated that when she was honest with employers about her problems, they would find reasons to fire her. (*Id.*).

On May 27, 2014, Dr. Basil reported to the Butler County Board of Developmental Disabilities (Board of Developmental Disabilities) that plaintiff "has an unusual cognitive problem." (Tr. 393-94). Overall, she scored in the "mild developmentally delayed range" on the Woodcock-Johnson Tests of Cognitive Abilities (WJ-III) with a GIA (General Intellectual Ability) score of 67, which was in the 1st percentile. However, her cognitive efficiency was

scored much lower at 54 (0.1 percentile). Her visual scanning was very low at 58 (0.3 percentile). Dr. Basil also noted that plaintiff had extreme difficulty with immediate visual memory (0.1 percentile) per RIAS (Reynolds Intellectual Assessment Scales) testing. He reported that her overall IQ was higher on the RIAS, but "the RIAS allows for a second guess on several of the subscales."

Dr. Basil further reported that plaintiff had experienced "great" frustration attempting "to succeed at various jobs." He stated that, "She had tried to make good faith efforts, but her cognitive disabilities (which are invisible to others) repeatedly have caused problems with coworkers and supervisors. Naturally, she had developed anxiety about meeting others' expectations despite her attempts to overcome her disabilities." Dr. Basil found based on cognitive testing on the WJ-III that she qualifies for "Developmentally Delayed, Mild" overall, in visual memory and scanning, and in immediate working memory.

### ii. *Board of Developmental Disabilities*

Dr. Gene Harris, Ph.D., and psychology assistant Eckart Wallish, M.A., evaluated plaintiff on behalf of the Butler County Board of Developmental Disabilities on October 31, 2014, to assist in determining whether she qualified for disability benefits and a possible future waiver. (Tr. 409-13). The report noted that plaintiff had been diagnosed with ADHD as a child and was prescribed medication, but she did not respond well; she was thought to have a Sensory Processing Disorder; and she had difficulty meeting the demands of competitive employment. (Tr. 409). The report noted she had been treated for major depression and a dysthymic disorder in the past, and she had been diagnosed with Mild Mental Retardation. (*Id.*).

During the evaluation, plaintiff appeared to give her best efforts on the tasks she was assigned. (Tr. 410). She "responded in a very slow and deliberate manner," and it "appeared that she was processing information very slowly." She appeared sullen, depressed, and anxious, and her eye contact was poor at times, but she did not engage in "any stereotyped behaviors." (*Id*).

Dr. Harris and his assistant administered a battery of tests. The Stanford Binet Intelligence Scales yielded scores of 60 for non-verbal IQ, 72 for visual IQ, and 64 for full-scale IQ, which placed plaintiff in the mildly mentally retarded range of overall intelligence. (*Id*.). Plaintiff's self-portrait for the "Goodenough Draw a Person Test" was "well enough integrated and included sufficient detail to attain a mental age of 6 years, 9 months," which Dr. Harris found was consistent with "overall intelligence within the mildly mentally retarded range." Plaintiff performed at an age equivalency of 7 years, 6 months on the Developmental Test of Visual Motor Integration, which required her to copy basic geometric forms in a structured box-like format. (Tr. 411). This reflected a mild deficiency in visual motor integration skills. The Vineland Adaptive Behavior Scales II showed a "moderate deficit" in overall adaptive functioning with some mild variability among her subskills. Plaintiff's age-equivalency ratings ranged from 3 years, 11 months to 8 years, 5 months in the areas of receptive and expressive language skills, written language skills, domestic skills, personal self-help skills, leisure time activities, interpersonal relationships, and coping skills.

Dr. Harris diagnosed plaintiff with depressive disorder NOS, anxiety disorder NOS, autistic disorder, and mild mental retardation. (Tr. 412). Due to "significant limitations" in her

intellectual and adaptive abilities, he recommended that she receive "necessary and relevant services" through the Board of Developmental Disabilities. He also recommended that she be referred for psychiatric and counseling services to address her mental health needs, some of which he opined were related to her autistic symptoms. (*Id.*).

### iii. *Dr. Nancy Schmidtgoessling, Ph.D.*

Dr. Schmidtgoessling evaluated plaintiff for disability purposes in August 2015. (Tr. 560-68). Plaintiff's mother reported that plaintiff had been diagnosed with "MMR (mild mental retardation) [and] autism." (Tr. 561). Plaintiff reported she had worked "a lot" of jobs and had been fired twice for not being able to complete tasks. Plaintiff reported she got overwhelmed quickly on a job, and there were complaints that she was often forgetful. Plaintiff also reported that her coworkers mocked her because she could not count money. (*Id.*).

On mental status examination, plaintiff had no abnormalities in flow of conversation and thought or in appearance and behavior. (Tr. 564). She was sometimes tearful and appeared anxious. Dr. Schmidtgoessling found plaintiff was alert and responsive. (Tr. 565). She was able to understand and follow directions. Her work pace was average to slow. Her memory for remote information was below average. Her ability to abstract similarities and her fund of knowledge were in the "much below average" range. In conversation, plaintiff appeared to be of "much below average" intellectual functioning. Dr. Schmidtgoessling found that plaintiff appeared to have limited insight and judgment, which was consistent with having substantially below-average intellectual functioning. In the testing, her effort and persistence appeared

adequate. (Tr. 566). She forgot some instructions, had an impulsive work style, and was very distractible.

Dr. Schmidtgoessling administered the WAIS-IV. Plaintiff's full-scale IQ was reported to be 50. (Tr. 568). All of her scores were "much below" average. Dr. Schmidtgoessling believed that her scores "may be somewhat of underestimates of her abilities," and they "appeared to be lower than what would have been anticipated given her presentation." (Tr. 566). Dr. Schmidtgoessling diagnosed depressive disorder NOS, anxiety disorder NOS, and unspecified neurocognitive disorder. (Tr. 567). Dr. Schmidtgoessling opined that plaintiff would have "significant difficulty" understanding, remembering, and following instructions. She would "likely have difficulty" maintaining concentration and attention and in maintaining persistence and pace to perform simple and multi-step tasks. (*Id.*). Plaintiff did not describe symptoms that would negatively impact her ability to interact with others. Dr. Schmidtgoessling opined that plaintiff's depression, anxiety, panic attacks and below-average intellectual functioning could negatively impact her ability to tolerate work stress. (*Id.*).

### iv. *State Agency Psychologists*

In September and December 2015, state agency psychologist Deryck Richardson, Ph.D., and psychiatrist Connie Jenkins, M.D., reviewed plaintiff's medical records and concluded that plaintiff could understand, remember, and carry out simple instructions for routine, repetitive tasks where there are no strict productivity expectations; tolerate occasional and superficial interpersonal contact; and adapt to minor changes that are expected and infrequent with help setting goals. (Tr. 80-82, 111-13). Dr. Jenkins noted that plaintiff had a

recent full-scale IQ at 50, which was considered to be an underestimate, and that plaintiff's full-scale IQ on testing during plaintiff's school years was reported to be in the 80-90 range. (Tr. 113). The non-examining mental health sources found plaintiff to be partially credible, noting she is able to communicate, work part-time, and follow simple instructions. (Tr. 78, 110).

### E. Specific Errors

Plaintiff alleges the ALJ committed the following errors: (1) the ALJ erroneously found at Step Three of the sequential evaluation process that plaintiff's impairments did not meet or medically equal Listing 12.05; and (2) the ALJ erred at Step Five[4] of the sequential evaluation process by failing to show that plaintiff could sustain full-time competitive employment without the assistance of a job coach or frequent over-the shoulder supervision. (Doc. 9).

#### 1. The ALJ's Step Three finding

Plaintiff argues that the ALJ erred in finding that her mental impairments did not meet Listing 12.05B, "Intellectual Disorder." (Doc. 9). Plaintiff contends that the ALJ rejected her reported IQ scores based on his own improper medical findings, which are not substantially supported by the evidence. Plaintiff further argues that the ALJ did not cite substantial evidence in support of his findings that plaintiff had only moderate deficits in certain areas of mental functioning, and she did not have significant deficits in adaptive functioning which manifested themselves prior to age 22.

---

[4] Plaintiff also asserts in connection with her second assignment of error that the ALJ erred at Step Four of the sequential evaluation process, which requires a showing that the claimant is no longer able to perform her past relevant work. *See supra* at 2-3. The Court need not address this alleged error because the ALJ found in plaintiff's favor at Step Four by deciding that plaintiff was not able to perform her part relevant work. (*See* Tr. 23).

The ALJ determines at Step Three of the sequential evaluation whether the claimant's disability meets a condition in the listing of impairments, 20 C.F.R. Pt. 404, Subpt. A, App. 1. The listings describe conditions that are "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a) (effective March 27, 2017). Each listed impairment is described in terms of its "signs, symptoms, and diagnostic indicators." *Joyce v. Commr. of Soc. Sec.*, 662 F. App'x 430, 433 (6th Cir. 2016) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). The claimant must present evidence establishing that she meets all of the criteria of a listing in order to establish eligibility for benefits at step three. *Id.* (citing *Sullivan*, 493 U.S. at 530). *See also Jones v. Commr. of Soc. Sec.*, No. 1:16-cv-68, 2017 WL 5015526, at *3 (E.D. Tenn. Aug. 22, 2017). "Because satisfying the listings during the third step yields an automatic determination of disability based on medical findings, rather than a judgment based on all relevant factors for an individual claimant, the evidentiary standards for a presumptive disability under the listings are more strenuous than for claims that proceed through the entire five-step evaluation." *Jones,* 2017 WL 5015526, at *3 (quoting *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 539 (6th Cir. 2014) (citing 20 C.F.R. §§ 416.925(d), 416.926; *Sullivan*, 493 U.S. at 532).

Listing 12.05 has two paragraphs, A and B, "that apply to only intellectual disorder." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00A(3). To meet either Listing 12.05A or 12.05B, the claimant "must have significantly subaverage general intellectual functioning; significant deficits in current adaptive functioning; and evidence that demonstrates or supports (is consistent with)

the conclusion that [the claimant's] disorder began prior to age 22." *Id.* An "Intellectual

disorder" meets Listing 12.05B when all three of the following criteria are satisfied:

1. Significantly subaverage general intellectual functioning evidenced by a or b:

    a. A full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence; or

    b. A full scale (or comparable) IQ score of 71-75 accompanied by a verbal or performance IQ score (or comparable part score) of 70 or below on an individually administered standardized test of general intelligence; and

2. Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

    a. Understand, remember, or apply information (see 12.00E1); or

    b. Interact with others (see 12.00E2); or

    c. Concentrate, persist, or maintain pace (see 12.00E3); or

    d. Adapt or manage oneself (see 12.00E4); and

3. The evidence about your current intellectual and adaptive functioning and about the history of your disorder demonstrates or supports the conclusion that the disorder began prior to your attainment of age 22.

20 C.F.R. Part 404, Subpt. P, App. I, 12.05B.[5]

An ALJ is not required to accept reported IQ scores in all instances. The ALJ may

"choose to disregard I.Q. scores that would normally lead to a finding of disability when those

scores were undermined by a [medical source's] full evaluation. *Dragon v. Comm'r of Soc. Sec.*,

---

[5] The Court reviews the SSA's final decision "using the rules that were in effect at the time [the SSA] issued the decision[]." *Revised Medical Criteria for Evaluating Mental Disorders*, 81 FR 66138-01, 2016 WL 5341732 (Sept. 26, 2016). This version of Listing 12.05B was effective beginning August 22, 2017.

470 F. App'x 454, 462 (6th Cir. 2012) (quoting *Daniels v. Comm'r of Soc. Sec.,* 70 F. App'x

868, 869, 872 (6th Cir. 2003) ("finding that substantial evidence supported the ALJ's finding that

claimant was not mentally retarded although claimant had a performance I.Q. of 67 because the

examining doctor also found claimant to be within the 'borderline range of intelligence' and

clinically 'appeared to function in the dull-normal range of intelligence'")). Further, the

regulations permit the ALJ to question the validity of test results in conjunction with other

factors. *Id.* "In assessing the validity of a claimant's I.Q., '[i]nformation from both medical and

nonmedical sources may be used to obtain detailed descriptions of the individual's activities of

daily living; social functioning; concentration, persistence and pace; or ability to tolerate

increased medical demands (stress).'" *Id.* at 462-63 (quoting *Brown v. Sec'y of Health & Human

Servs.,* 948 F.2d 268, 269 (6th Cir. 1991) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, §

12.00D)).

However, the ALJ cannot disregard a full evaluation that "serve[s] to reinforce the I.Q.

scores, rather than undermine them." *Id.* at 462. Moreover, certain activities are not necessarily

inconsistent with a valid I.Q. test score that falls just below 70, such as "use of public transit,

making change at a grocery store, doing laundry . . ., cleaning, limited reading comprehension

(equivalent to a third-grade education), or the ability to keep records of work activity." *Id.* at

270. Thus, in *Dragon*, 470 F. App'x at 463, the Court rejected the ALJ's decision to invalidate

the reported I.Q. score based on factors the ALJ erroneously found were inconsistent with an

intellectual disorder, which were: (1) the fact that plaintiff was a high school graduate, and (2)

the fact that she was a mother who appeared to be doing a good job taking care of her six-year

old daughter. *Id.* at 463. The appellate court found it irrelevant that plaintiff was able to graduate from high school since she had done so only with an IEP, and she had never passed her ninth-grade proficiency tests. *Id.* Also, though she cared for her daughter, she lived with another parental figure. *Id.* In addition, the appellate court found that her performance during the testing doctor's evaluation was not inconsistent with her tested I.Q. scores. *Id.* Thus, the Court found the ALJ's decision to invalidate the I.Q. scores was not supported by substantial evidence. *Id.*

Here, the ALJ determined that plaintiff did not meet all of the requirements of Listing 12.05B. (Tr. 18). First, the ALJ found the results of three intelligence tests administered to plaintiff over a two-year period by Drs. Basil, Harris, and Schmidtgoessling were not reliable because they varied substantially. (*Id.*). The ALJ further found that none of the results appeared to reflect plaintiff's actual ability, and the psychologists who administered the tests seemed to question the results. (*Id.*).

Plaintiff challenges the ALJ's conclusion that plaintiff's IQ test results do not satisfy the requirements of Listing 12.05B. (Doc. 9 at 6-8). Plaintiff notes that the record includes several IQ scores of 70 or below, which on their face satisfy the first prong of 12.05B. These scores were reported by Dr. Basil, who treated and tested plaintiff in 2013 and 2014; Dr. Harris, who tested plaintiff in 2014; and Dr. Schmidtgoessling, who evaluated and tested plaintiff in 2015. Plaintiff argues that the ALJ improperly rejected the scores as invalid. The Commissioner counters that the ALJ correctly concluded the IQ scores obtained by these sources varied widely and were not reliable. (Doc. 13 at 5-9).

Evaluators reported varied IQ scores for plaintiff. (Tr. 18). Dr. Basil reported a GIA score of 67 on the WJ-III administered in 2013, which reflected plaintiff's information processing problems. (Tr. 393-94, 395). However, he opined that plaintiff's significantly higher IQ score of 88 on the RIAS was likely more reflective of her true conceptual abilities. (Tr. 393, 396-400). Dr. Harris reported that when tested in October 2014, plaintiff had a full-scale IQ of 64, a verbal IQ of 72, and a nonverbal IQ of 60. (Tr. 410). In August 2015, Dr. Schmidtgoessling reported substantially lower WAIS-IV scores of 50 for plaintiff's full-scale IQ and 68 for verbal comprehension, 52 for perceptual reasoning, 55 for working memory, and 50 for processing speed. (Tr. 566, 568). The ALJ also noted that the WAIS had been administered to plaintiff while she was in school, and a full-scale IQ score of 96 was reported (at age 17) in addition to a score in the 80s from a prior exam. (Tr. 17, citing Tr. 368). Based on the significant variance in these scores, the ALJ reasonably questioned whether the reported IQ scores were reliable.

Further, at least two of the psychologists who reported Listing-level IQ scores appeared to question whether the scores were reflective of plaintiff's actual abilities. Only Dr. Harris did not give an opinion as to whether the scores he reported were valid or invalid.[6] Dr. Basil reported that plaintiff scored 67 overall and in the first percentile on the WJ-III he administered, which Dr. Basil found was in "the mild developmentally delayed range," and that the test results

---

[6] The ALJ correctly notes that Dr. Harris reported "a great deal of variability" among plaintiff's subskills and observed that plaintiff "responded in a slow and deliberate manner," she "presented as a bit sullen, depressed, and anxious," and "she had poor eye contact at times but she never engaged in any stereotyped behaviors." (Tr. 18, citing Tr. 409-12). However, contrary to the ALJ's finding, Dr. Harris did not appear to question the IQ results he reported or indicate that any of the factors he noted impacted the validity of plaintiff's IQ scores such that the test results did not reflect plaintiff's actual abilities. (Id.).

reflected information processing problems. (Tr. 393-94). However, Dr. Basil opined that plaintiff's IQ score on another test, the RIAS, was higher and reflected the actual level of plaintiff's conceptual abilities.[7] (Tr. 393). Dr. Basil concluded based on cognitive testing on the WJ-III overall that plaintiff qualified for a diagnosis of "Developmentally Delayed, Mild" in visual memory, scanning, and immediate working memory. (Tr. 394). The ALJ reasonably concluded from Dr. Basil's report, read as a whole, that Dr. Basil doubted whether the IQ score of 67 generated on the WJ-III accurately reflected plaintiff's overall IQ. The ALJ was entitled to give Dr. Basil's findings "little weight" at Step Three of the sequential evaluation process based in part on questions as to the reliability of the IQ scores he reported. (*See* Tr. 18).

Dr. Schmidtgoessling performed a consultative evaluation in August 2015 at which she interviewed plaintiff and her mother, and a Psychology Aide administered the WAIS-IV. (Tr. 560-70). Plaintiff reportedly showed adequate effort and persistence during the testing, but she forgot some of the instructions, had an impulsive work style, tended to look around the room, was distractible, and "tended to jump on instructions." (Tr. 566). Plaintiff's full-scale IQ score was 50, which according to Dr. Schmidtgoessling placed her in what was formerly known as the "mild to moderate ranges of mental retardation." (*Id.*). But Dr. Schmidtgoessling concluded that the test scores "may be somewhat of [sic] underestimates of her abilities." (*Id.*). Dr. Schmidtgoessling also reported that while all of plaintiff's scores were "much below average," they "appeared to be lower than what would have been anticipated from her presentation." (*Id.*).

---

[7] Plaintiff's Composite Intelligence Index score on the RIAS was 88, which Dr. Basil found fell "within the range of scores designated as below average and exceeds the performance of 21% of individuals at [plaintiff's] age." (Tr. 398).

As the ALJ reasonably found, Dr. Schmidtgoessling appears to have questioned whether the test scores she reported accurately reflected plaintiff's actual intellectual capacity. (*See* Tr. 18-19).

The ALJ acknowledged that on their face, these reported scores fell within the scope of Listing 12.05B. (Tr. 19). The ALJ found, though, that plaintiff's level of academic functioning belied the accuracy of plaintiff's IQ scores and refuted the possibility that plaintiff had an intellectual disability that met Listing 12.05B. (*Id.*). The ALJ specifically relied on evidence showing that plaintiff graduated from high school in 2008; she had earned A's and B's in "academically challenging classes" like Biology, English, and Geometry; and her GPA was 3.314. (Tr. 19, citing Tr. 339-81). The ALJ also relied on the assessments of state agency reviewing psychologist Dr. Richardson and psychiatrist Dr. Jenkins, who found that plaintiff could perform simple, routine tasks with no strict production requirements, little workplace change, and no more than superficial social contacts. (Tr. 19, citing Tr. 70-84, 85-99, 102-116, 117-131). Finally, the ALJ found that the therapy notes of plaintiff's mental health counselor, Corine Pearson, "indicate a reasonable level of functioning." The ALJ noted that more recent therapy reports showed plaintiff had expanded her social circle and vacationed with friends and relatives; asserted herself at work; and was overall more hopeful and positive. (Tr. 19).

Plaintiff challenges the ALJ's finding that her level of adaptive functioning does not support the Listing-level IQ scores reported in the record and precludes the possibility that she suffers from an intellectual disability that meets 12.05B. (*Id.*). Plaintiff argues the ALJ's finding is not substantially supported because the ALJ did not evaluate her school performance "in the context of [her] special Individual Education Program while in school." (Doc. 9 at 8).

Plaintiff alleges that her school records indicate that she "was considered to have a 'specific learning disability' that required special accommodations." (*Id.*, citing Tr. 355).

The only evidence plaintiff cites to show the ALJ erred by relying on her academic performance is a single school record for the 2008-09 school year. (Doc. 9 at 8, citing Tr. 355). The record indicates that an IEP was created or modified for plaintiff effective March 17, 2008, for a disability in the category of "Specific Learning Disability." (*Id.*). In light of the other indicators of plaintiff's academic performance, the fact that plaintiff had an IEP for a learning disability is insufficient to show that plaintiff had an intellectual disability that met the requirements of 12.05B. Rather, considered as a whole, the school records support the ALJ's finding that plaintiff's IQ scores were not reflective of her true intellectual functioning.

The records show that plaintiff had received special education services since 1998, but the IEP called for special education services "outside the regular classroom for less than 21% of the school day." (Tr. 356, 364). In other words, 79% of plaintiff's time was spent in a regular classroom. Testing in 2007 disclosed her reading comprehension skill was "poor" and her math calculation skill was "very poor." (Tr. 365). However, although plaintiff needed repeated reinstruction and constant reinforcement of concepts, plaintiff's math tutor reported that her overall math skills were exceeding expectations and her test/quiz scores were adequate. (Tr. 367). A WAIS test administered in 2007 yielded a full-scale IQ score of 96 compared to a previous score of 80. (Tr. 368). The evaluator concluded that the "evaluation suggests that she has the ability to perform age appropriate cognitive activities." (Tr. 368). The records also show that plaintiff passed all of her Ohio 10th-grade proficiency tests, albeit with accommodations

provided pursuant to the IEP. (Tr. 360). The evidence of plaintiff's successful academic performance substantially supports the ALJ's finding that the IQ test results reported between 2013 and 2015 were not valid indicators of an intellectual disorder that satisfies Listing 12.05B. The ALJ did not err by finding the first prong of Listing 12.05B was not met.

Even assuming the ALJ did err by finding that plaintiff's IQ scores were not reliable indicators of a Listing 12.05B disorder, the Court's review of the ALJ's decision would not end there. IQ scores are insufficient in and of themselves to establish that a claimant's intellectual functioning was "significantly subaverage." *Jones*, 2017 WL 5015526, at *4 (quoting *Golden v. Comm'r of Soc. Sec.*, 591 F. App'x 505, 506 (6th Cir. 2015)). Plaintiff must also establish that she had "deficits in adaptive functioning" which "initially manifested before 22" to establish she meets or equals Listing 12.05B. *Id.* at *5. Plaintiff argues that the ALJ erred in finding she failed to make this showing. (Doc. 9 at 8, citing Tr. 16). Plaintiff alleges she has "significant deficits in adaptive functioning" as evidenced by: (1) Dr. Schmidtgoessling's August 2015 assessment (Tr. 567) and the state agency psychologists' reports giving her opinion "great weight" (Tr. 93, 110); (2) "Vineland testing" results reported by Dr. Harris, which showed plaintiff had the communication skills of a five-year old and other adaptive skills of a five-to-nine-year old (Tr. 387); and (3) treatment notes which documented that plaintiff was unable to prepare a meal, create a grocery list, or go to the store (Tr. 857). (Doc. 9 at 9). Plaintiff also alleges that a Board of Developmental Disabilities assessment establishes that her significant deficits in adaptive functioning manifested before age 22.

The ALJ found that the second prong of Listing 12.05B was not satisfied because plaintiff did not manifest extreme limitation of one, or marked limitation of two, areas of mental functioning specified in Listing 12.05B(2). (Tr. 16-17). The ALJ found that plaintiff demonstrated only moderate limitation in her ability to "[u]nderstand, remember, or apply information" based on evidence showing that she completed high school and some training for animal care, and she had successfully learned coping techniques (including a six-step technique) from her therapist. (Tr. 16, citing Tr. 653). He found moderate limitation in her ability to "[i]nteract with others" based on evidence that she has some difficulty responding to real or perceived criticism and some difficulties in public settings (Tr. 637), but she has a long-term boyfriend and at least two friends with whom she visits and vacations. (Tr. 16). He found moderate limitation in her ability to "[c]oncentrate, persist, or maintain pace" based on evidence she has difficulties working quickly and she worked slowly on testing. (*Id.*, citing Tr. 565). Finally, the ALJ found mild limitation in her ability to "[a]dapt or manage oneself" based on evidence that she frequently expressed a desire to move out of her parents' home due to conflicts with her father (Tr. 728, 731, 735, 767, 848, 977), but she was stymied by the inability to find a place that would allow her to have multiple pets. (Tr. 16). The ALJ further relied on contemporaneous school records and therapy notes which indicated a "reasonable level of functioning" to find that plaintiff did not suffer from an intellectual disability which manifested before age 22. (Tr. 17, 19).

The evidence plaintiff cites in support of her claim that her intellectual impairment met Listing 12.05B indicates that plaintiff struggled with certain areas of adaptive functioning. *See,*

*e.g.*, Tr. 567 (Dr. Schmidtgoessling opined that plaintiff had "significant difficulty" understanding, remembering, and following instructions" and "difficulty" maintaining concentration, persistence, and pace to perform simple and multi-step tasks). However, the ALJ gave Dr. Schmidtgoessling's opinion only "limited weight" for reasons he thoroughly explained in his written decision. *See* 20 C.F.R. § 404.1527(c), 416.927(c).[8] In addition, though plaintiff's mental health counselor, Ms. Pearson, reported plaintiff's subjective complaints regarding her inability to perform certain daily tasks, the ALJ found that Ms. Pearson's hearing testimony was "quite vague" and she did not provide any specific functional limitations. (Tr. 19). In fact, Ms. Pearson testified that plaintiff was presently holding her job without a job coach (Tr. 61), which the ALJ reasonably found indicated that plaintiff was functioning "rather well." (Tr. 19). The ALJ also found that Ms. Pearson accepted plaintiff's subjective complaints despite therapy notes which actually "indicate[d] a reasonable level of functioning." (Tr. 19). Finally, the ALJ discounted the reliability of the intelligence tests administered by Dr. Harris and the other psychologists for the reasons explained *supra*. The ALJ reasonably determined based on the evidence of record that plaintiff's deficits in adaptive functioning were not "marked" or "extreme" so as to satisfy the second prong of Listing 12.05B.

Even assuming plaintiff's intellectual impairment satisfied the second prong of Listing 12.05B, the ALJ cited substantial evidence to support his finding that plaintiff did not satisfy the

---

[8] A non-treating source's opinion is weighed based on the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6). These regulations have been amended for claims filed on or after March 27, 2017. *Revisions to Rules Regarding the Evaluation of Medical Evidence; Correction*: 82 FR 15132-01, 2017 WL 1105368 (March 27, 2017). The amendments do not apply to plaintiff's claims, which she filed in 2015.

third requirement of Listing 12.05B by showing that her intellectual disability manifested prior to age 22. (Tr. 17). Plaintiff contends the ALJ's finding is not supported based on a June 2014 eligibility assessment by the Board of Developmental Disabilities, concluding that plaintiff was entitled to services based on an intellectual disability which manifested before age 22. (Doc. 9 at 9, citing Tr. 408). The report indicates that plaintiff has a disability - "Developmental Delayed Mild" - per Dr. Basil's May 2014 report. (Tr. 408). A box is checked which indicates the disability manifested before age 22. (*Id.*). Boxes are also checked which indicate that completion of the OEDI (Ohio Eligibility Determination Instrument) showed "substantial functional limitations" in the areas of "self care," "self direction," "capacity for independent living," "economic self-sufficiency," and "receptive and expressive language." (*Id.*). However, the report was generated when plaintiff was age 24, and the bases for the findings made in the report regarding the onset of plaintiff's disability and areas of substantial functional limitation are unclear. Thus, the report alone is not substantial evidence of plaintiff's adaptive functioning prior to age 22.

The ALJ instead reasonably relied on contemporaneous school records and therapy notes which indicated a "reasonable level of functioning" to find that plaintiff did not suffer from an intellectual disability which manifested before age 22. (Tr. 17, 19). School personnel diagnosed plaintiff with only a learning disorder, and a WAIS IQ test administered to plaintiff by a school psychologist in February 2007 yielded a full-scale IQ score of 96. (Tr. 368). It was noted that plaintiff's score on a previous IQ test was 80. (*Id.*). The evaluator found that the score revealed plaintiff's overall intellectual ability was "classified as average when compared [to] same age

24

peers and to correspond to a percentile rank of 39." (*Id.*). The evaluator stated that plaintiff was "friendly and cooperative" during the evaluation, and the evaluation suggested she had "the ability to perform age appropriate cognitive activities." (*Id.*). Plaintiff challenges the score on the grounds the test was "vague and not particularly descriptive"; the test report generally cautions against variances to be expected in intelligence tests over time and among different tests; and it is "unclear whether the school psychologist was even an acceptable medical source." (Doc. 9 at 6, citing Tr. 368). However, plaintiff has not pointed to any evidence in the record or cited any authority that calls into question the qualifications of the school psychologist or the validity of these test results.

In addition, though plaintiff received a number of accommodations as part of her IEP while in school, she spent the majority of her time in a regular classroom. (Tr. 356). Plaintiff achieved above average grades throughout high school with accommodations that were fairly limited in scope, consisting of extended time, spell check, resource room access, tests and quizzes read to her upon request, and the option to retake any test on which she scored below 70%. (Tr. 348). Plaintiff passed all sections of the Ohio graduation test. (Tr. 360). Plaintiff's ability to succeed at school while spending over three-quarters of her time in a regular classroom, albeit with some accommodations, supports the ALJ's finding that plaintiff did not suffer from an intellectual disability that manifested prior to age 22. *See Joyce*, 662 F. App'x at 434 (citing *Eddy v. Comm'r of Soc. Sec.*, 506 F. App'x 508, 510 (6th Cir. 2012) ("claimant's eighth-grade education and enrollment in special education classes did not evidence significantly below average intelligence"); *cf. Carmack v. Barnhart*, 147 F. App'x 557, 560 (6th Cir. 2005)

("claimant's GED supported ALJ's denial of benefits under 12.05C"); *Foster v. Halter*, 279 F.3d 348, 352, 354-55 (6th Cir. 2001) ("claimant's ninth-grade education and history of special education classes did not demonstrate developmental onset of intellectual disability despite four unsuccessful attempts at obtaining GED")). Plaintiff's school records substantially support the ALJ's finding that plaintiff did not experience the onset of "significantly subaverage general intellectual functioning" before age 22.

Plaintiff's first assignment of error should be overruled.

### 2. The ALJ's Step Five Finding

Plaintiff contends that the ALJ's step five finding is not supported by substantial evidence. (Doc. 9 at 10-11). Plaintiff alleges that the evidence shows she cannot sustain full-time competitive employment without the assistance of a job coach or frequent over-the-shoulder supervision for even basis tasks. Plaintiff asserts that the record establishes she repeatedly lost jobs "without a job coach or accommodations in the past and that employers always found reasons to fire her because of limitations" (Tr. 391-93, 409, 619); she was "made fun of by her peers because of limitations" (*Id.*); she had difficulty keeping up with her only past relevant work as an animal caretaker, which the ALJ found she could not perform due to her functional limitations (Tr. 23, 237-52); and plaintiff's mental health counselor, Ms. Pierson, testified at the ALJ hearing that plaintiff would not have been able to obtain her part-time cashier job without a job coach, and increasing her hours to full-time would be "extremely difficult," would "significantly increase" plaintiff's anxiety, and would cause her to become overwhelmed (Tr. 61). (Doc. 9 at 11). Plaintiff argues that the ALJ erred by omitting the accommodation of a job

coach or frequent over-the-shoulder supervision from the hypothetical to the VE.[9] (*Id.*).

Plaintiff alleges the error was not harmless because the VE testified that an individual who required such accommodation for even basic tasks "would be unable to sustain competitive employment." (*Id.*).

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010). However, the ALJ's hypothetical question must include only the alleged limitations of the claimant which the ALJ reasonably accepts as credible and that are supported by the evidence. *See Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010) ("[I]n formulating a hypothetical question, an ALJ is only required to incorporate those limitations which he has deemed credible.") (citing *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118-19 (6th Cir. 1994)); *Turcus v. Soc. Sec. Admin.*, 110 F. App'x 630, 633 (6th Cir. 2004) ("The ALJ is not obligated to include unsubstantiated complaints and restrictions in his hypothetical questions."). If the ALJ's hypothetical question included the limits that the ALJ found credible, the ALJ could properly rely on the VE's testimony as substantial evidence that the plaintiff is able to perform jobs that exist in significant numbers in the national economy. *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007).

---

[9] Plaintiff notes that, "The VE also testified that an individual who was off-task 15% of the workday would be unable to sustain competitive employment." (Doc. 9 at 11, citing Tr. 67). However, plaintiff does not argue, and does not cite any evidence to show, that the ALJ erred by omitting this limitation from the hypothetical question posed to the VE.

Plaintiff has not pointed to opinion or other evidence that demonstrates she required a job coach or over-the-shoulder supervision to perform sustained competitive employment. Instead, plaintiff simply relies on evidence which consists of her subjective reports included in a January 2014 client intake sheet (Tr. 391-92); Dr. Basil's report to the Board of Developmental Disabilities, which did not include an assessment of functional limitations or specify necessary accommodations (Tr. 393-94); background information included in Dr. Harris' evaluation report (Tr. 409); a July 2016 list of diagnoses made by providers at previous encounters (Tr. 619); and her employment and earnings record (Tr. 237-52). The ALJ did not credit plaintiff's subjective reports and the opinion evidence to the extent they indicated the need for mental restrictions beyond "limited social interaction" and "reduced production standards." (Tr. 22). Rather, the ALJ relied on substantial medical and other evidence to find that plaintiff's functioning improved over time with counseling and medication, and she did not require a job coach to retain her job. (*See* Tr. 19, 21-22). This evidence includes the reports of the state agency reviewing mental health providers, Drs. Richardson and Jenkins, which the ALJ gave "substantial weight." (Tr. 19, citing Tr. 70-84, 85-99, 102-116, 117-131). They assessed plaintiff as able to perform simple, routine tasks with no strict production requirements, little workplace change, and no more than superficial social contacts. (Tr. 19).

Thus, the hypothetical question to the VE incorporated all of the functional limitations that the ALJ found to be credible and supported by the evidence. Plaintiff has not shown that the ALJ omitted from the hypothetical any functional limitations that were substantially supported by the evidence. Plaintiff's second assignment of error should be overruled.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **AFFIRMED** and this matter be terminated on the Court's docket.

Date: ___1/22/2020___

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CHELSEA N. COMBS

  Plaintiff,

  vs.

COMMISSIONER OF
SOCIAL SECURITY,

  Defendant.

Case No. 1:18-cv-647

Barrett, J.
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).